UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

01 FEB 26 PM 3:56

H.D. OF ALABAMA

| | | |
|---|---|---|
| JOE MATTHEW JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 98-S-2613-NE |
| | ) | |
| DANIEL S. GOLDIN, | ) | |
| Administrator, National | ) | |
| Aeronautics and Space | ) | ENTERED |
| Administration, | ) | |
| | ) | FEB 26 2001 |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff, Joe Matthew Jones, claims his job duties as a Safety Specialist at the George C. Marshall Space Flight Center were reduced because he entered the Employee Assistance Program for the purpose of treating his substance abuse problem. He also contends that his supervisors asked him about his substance abuse, coerced him into telling his coworkers about it, and held meetings during which they discussed it. Plaintiff further alleges that his supervisors subjected him to constant scrutiny, asked him to consent to random drug testing, began the process of terminating his employment, and barred him from Redstone Arsenal.[1]

Plaintiff filed the present action *pro se* on October 15, 1998, seeking redress under several federal statutes and also asserting

---

[1] Redstone Arsenal is the military installation on which the Marshall Space Flight Center is located.

a supplemental state law claim for intentional infliction of emotional distress.    Most of plaintiff's claims have been dismissed.[2]  His sole remaining claim is under the Rehabilitation Act of 1973, 29 U.S.C. § 704 *et seq*.  Plaintiff filed an amended complaint (doc. no. 48) on April 3, 2000, alleging that his employers' actions constituted unlawful retaliation and an unlawful failure to accommodate his disability in violation of the Rehabilitation Act.  He seeks reinstatement, back pay, compensatory damages, attorney's fees, and costs.    The action presently is before the court on defendant's motion for summary judgement (doc. no. 50).  Upon consideration of the motion, pleadings, briefs, and evidentiary submissions, this court concludes the defendant's motion is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[2]This court's order of March 23, 1999 (doc. no. 23) dismissed plaintiff's claims alleged under 5 U.S.C. § 2302(b), 5 U.S.C. § 552a, 42 U.S.C. § 290ee-3, and 42 U.S.C. § 290-3(f).  Plaintiff's claim under the Civil Service Reform Act and claim for intentional infliction of emotional distress were dismissed by this court's order of April 26, 1999 (doc. no. 30).  Finally, this court dismissed plaintiff's claim for sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, by its order of June 29, 1999 (doc. no. 36).

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.*; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific

facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that

inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed or are stated in a light most favorable to plaintiff.

## II. SUMMARY OF FACTS

### A.   Plaintiff's Employment History

Joe Matthew Jones was employed by the National Aeronautics and Space Administration ("NASA") at its George C. Marshall Space Flight Center from 1987 until February 29, 1996, when he resigned. In December of 1994, he began working as a junior Safety and

Occupational Health Specialist (GS-018-07) in the Shuttle Assurance Office, Industrial Safety Office, Safety and Mission Assurance Office, of the Marshall Space Flight Center ("MSFC").[3] The position required plaintiff to perform "a variety of duties involved with conducting safety inspections[,] and adapting and enforcing safety regulations."[4] Such duties included, for example, learning the hazards related to rocket engine stands, high pressure gaseous systems, and construction sites.[5] Plaintiff also was required to learn about safety standards and statutes, assist higher graded specialists in conducting safety inspections, prepare reports on safety inspections, conduct presentations to MSFC employees about safety, prepare and implement safety guidelines, and assist with investigations of industrial accidents.[6] The position involved "frequent exposure, during inspections and surveys, to a variety of machine and equipment operations, hazardous materials, high noise levels, and temperature extremes."[7]

All of plaintiff's work was supervised by safety specialists

---

[3]Plaintiff's evidentiary submission in opposition to defendant's motion for summary judgment (doc. no. 58), Ex. A at ¶ 2.  The record is not clear with respect to plaintiff's employment positions prior to his transfer to the Industrial Safety Office.

[4]Defendant's evidentiary submission in support of defendant's motion for summary judgment (doc. no. 54), Tab A, (Bates stamped exhibit 2) at 2.

[5]*Id.*

[6]*Id.*

[7]*Id.*

and safety engineers.[8]   He primarily assisted two of the senior Safety Specialists, Lane Pugh and Judy McNeil, in performing their assigned inspection responsibilities.[9]

Plaintiff performed satisfactorily in his position.   The Safety Specialists who were more senior to plaintiff routinely provided informal evaluations of plaintiff's work to their mutual supervisor, David Harris, the Director of the Industrial Safety Office.[10]   Harris considered plaintiff to be "an energetic and valuable asset" to the Industrial Safety Office.[11]   Harris was satisfied with the quality of plaintiff's work as of October 1995, when he assigned plaintiff a rating of "outstanding" on his annual Performance Review.[12]

**B.    Plaintiff's Abuse of Illegal Substances, Absence from Work, and Involvement in the Five Points Scam.**

During the autumn of 1994, senior Safety Specialist Lane Pugh recommended that Harris hire plaintiff, who then was employed elsewhere within the Marshall Space Flight Center.[13]   Before offering plaintiff the position of junior Safety and Occupational

---

[8]*See* Plaintiff's evidentiary submission, Ex. C at 3,10.
[9]*Id.* Tab C at 4.
[10]*Id.*
[11]*Id.* at 5.
[12]*Id.* at 4
[13]*Id.* at 2.

Health Specialist, Harris spoke with Cary Reily, who then was plaintiff's supervisor.  Reily praised plaintiff's work.[14]  Harris subsequently interviewed plaintiff, and then hired him.[15]  Before plaintiff started working in the Industrial Safety Office, however, Jim Newton, a manager in Reily's management chain, called Harris to inform him that plaintiff previously had a substance abuse problem.[16]  Newton also told Harris that plaintiff had utilized the MSFC Employee Assistance Program ("EAP"), and that plaintiff apparently had overcome the substance abuse problem.

Later, in September of 1995, Harris encountered Lane Pugh at a local music festival.[17]  During their conversation, Pugh told Harris that, prior to plaintiff's transfer to the Industrial Safety Office, he had a substance abuse problem.  Harris replied that he already knew about plaintiff's problem, but did not reveal his source.[18]

Plaintiff has a substantial history of illegal drug use. Beginning in December of 1993, and continuing until August of 1994, plaintiff used marijuana and "crack" cocaine.  He smoked "maybe one

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* at 4.
[18] *Id.*

or two [marijuana] joints a week."[19]   He smoked "mostly at
nighttime, close to bedtime,"[20] which allowed him to "relax a little
bit" and "get a good night's sleep."[21]  Plaintiff used crack cocaine
"two or three times a month on weekends only."[22]  He testified in
deposition that the effects of marijuana ceased "[w]ithin an hour,"
and that the effects of "crack" lasted "probably a little longer
... up to two, three hours."[23]  He also asserted that his use of
such substances did not impair his mental functioning the following
day.[24]

Plaintiff ceased the use of illegal drugs in August of 1994.[25]
He remained drug-free until October of 1995, when he experienced a
relapse.  Plaintiff again began using "crack" cocaine on weekends,
Fridays and Saturdays only.[26]  This time, plaintiff purchased and
used one $20 rock of "crack" each weekend, which was less than he
previously had used.[27]  Plaintiff maintains that he never used drugs
during work hours or on government property.[28]

---

[19]Defendant's evidentiary submission, Tab A (Jones deposition) at 63.
[20]*Id.* at 66.
[21]*Id.*
[22]Id., Tab F at ¶ 5.
[23]Plaintiff's evidentiary submission, Ex. A at 66.
[24]*Id.*
[25]*See* Defendant's evidentiary submission, Ex. F ¶ 5.
[26]Plaintiff's evidentiary submission, Ex. A at 67.
[27]*Id.*
[28]*See* Defendant's evidentiary submission, Tab F. at ¶ 5.

On Friday, November 17, 1995, plaintiff telephoned Harris at home.   Plaintiff told Harris that he was "in the midst of a personal crisis," and would be absent from work for a few days.[29] Plaintiff said that he would be utilizing NASA's Employee Assistance Program, and that he had contacted Dr. Anne Smith, the EAP counselor.[30]  Plaintiff did not tell Harris that his "crisis" was precipitated by the use or abuse of controlled substances, nor did he mention that he planned to admit himself to Crestwood Hospital.[31]

Plaintiff admitted himself to Crestwood Hospital, where he was treated by a physician for substance abuse.[32]   Following his treatment at Crestwood, plaintiff entered an after care program in Fayetteville, Tennessee.[33]  Plaintiff returned to work on November 22, 1995, where he met with Dr. Anne Smith, an EAP counselor.[34]

Unbeknownst to plaintiff, however, several events transpired during his brief absence.   On the evening of November 17th, the same day plaintiff had earlier telephoned Harris to tell him of his "personal crisis" and intent to be off-work for several days,

---

[29]See Plaintiff's evidentiary submission, Ex. A at ¶ 4.
[30]Id.
[31]Id.
[32]Id. at ¶ 5.
[33]Id.
[34]Id. at ¶ 7.

Harris read in *The Huntsville Times* the following anonymous report:

> There is a con man operating in Five Points.  He drives
> a white Toyota pickup truck with a blue stripe on the
> side.  His story is that he works at Marshall Space
> Flight Center and lives in Tennessee.  He left his check
> book at home and he needs to borrow 10 dollars.  He has
> pulled this scam on several people, and I witnessed him
> talking to three different people Sunday morning.[35]

The description of the individual and motor vehicle led Harris to

suspect that plaintiff was the "Five Points Con Man."[36]

The following day, November 18, 1995, Harris attempted to

contact plaintiff at his home in Lynchburg, Tennessee.[37]

Plaintiff's mother answered the telephone and told Harris that her

son was not there.[38]  Harris related to her his concerns over the

anonymous newspaper report.[39]  Plaintiff's mother responded that her

son had recently used "crack" cocaine, and that he had been near

death during one episode.[40]

Later that same afternoon, plaintiff's brother, Mark Jones,

who also worked at the Marshall Space Flight Center, telephoned

Harris at his home.  Mark Jones discussed his brother's "troubles,"

---

[35]Defendant's evidentiary submission, Tab A (Bates stamped exhibit 1).  *See*
Plaintiff's evidentiary submission, Ex. C at 6.

[36]Plaintiff's evidentiary submission, Ex. C at 6.

[37]*Id.*

[38]*Id.*

[39]*Id.*

[40]*Id.*

and "indicated he would deal with [plaintiff] ... on the subject of the Five Points episodes appropriate to the facts of the matter as he would be able to determine."[41]

During the evening of that same day, November 18, 1995, a news article relating the activities of the "Five Points Con Man" appeared in *The Huntsville Times*.  The article reported:  "A Tennessee man may be using the federal government shutdown to con good Samaritans."[42]  A police officer commented that "the man could be charged with theft by deception," and requested that anyone with information about the case contact him.[43]

On the morning of Monday, November 20th, Harris met with his supervisor Jim Ehl, the Director of Safety Mission Assurance.[44] Harris informed Ehl of plaintiff's drug problem and of his suspected involvement in the Five Points scam.

## C.   Plaintiff's Affair with Lane Pugh

Plaintiff was involved in an affair with his married co-worker, Lane Pugh, from July until October of 1995.[45]  Pugh was a senior Safety Specialist and, as such, was plaintiff's *de facto*

---

[41]*Id.*

[42]Defendant's evidentiary submission, Tab A (Bates stamped exhibit 1).

[43]*Id.*

[44]Plaintiff's evidentiary submission, Ex. C at 7.

[45]*Id.*, Ex. A at ¶ 3.

supervisor.[46]  Plaintiff was distraught following the termination of their sexual relationship, and discussed it with Dr. Smith, his EAP counselor.  It was Dr. Smith's impression that plaintiff's use of illegal drugs was secondary to the emotional problems precipitated by his breakup with Pugh.[47]  She observed that plaintiff "genuinely loved Ms. Pugh and was deeply hurt by the relationship ending."[48]

In November of 1995, plaintiff encountered Pugh and another Marshall Space Flight Center co-worker in a parking lot in Madison County.[49]  During the encounter, Pugh informed plaintiff that she planned to have him fired.[50]

During the week of November 20th, Pugh visited Harris and complained about plaintiff.  She referred to the article about the "Five Points Con Man" in *The Huntsville Times*, and told Harris that plaintiff had deceived her in a transaction involving automobile repairs.[51]

---

[46] *Id.*

[47]*Id.*, Ex. B at 3.

[48]*Id.*

[49]*Id.*, Ex. A at ¶ 8.

[50]*Id.*

[51]*Id.*, Ex. C. at 8.  An investigator later recorded Pugh's allegations about the transaction as follows:

[Pugh] told us that some time in October or November of 1995, [plaintiff] volunteered to help her arrange for one of his friends (a mechanic) to repair her car.  The agreed upon price was $300.

**D.   Plaintiff's Return to Work and Actions Taken by His Supervisors**

Following plaintiff's return to work on November 22, 1995, Harris began investigating plaintiff's use of controlled substances.  On November 28th, Harris informed plaintiff that he had scheduled a meeting with Marshall Space Flight Center administrators for the purpose of discussing "what to do with [him]."[52]  A meeting was held in the office of Frank Bynum (MSFC Personnel Director) on November 30, 1995.  It was attended by Harris, Ehl, Bynum, Mack Blackman (Personnel Management Specialist), and others.[53]  Various topics were discussed.  For example, the attendees discussed ways to procure evidence of plaintiff's illegal drug use.  Bynam asked Harris to procure statements from at least two of plaintiff's co-workers who may have heard him admitting to the use of a specific drug.[54]  Next, the

---

According to Ms. Pugh, [plaintiff] told her that the mechanic needed the entire sum "up front" in order to buy parts.  She said that she gave [plaintiff] the entire sum, trusting that he would give the money to the mechanic.  Ms. Pugh stated that [plaintiff] insisted on taking the money in cash.  According to Ms. Pugh, several days later she learned from the Mechanic's wife that the mechanic had only received $250 of the promised $300.  According to [plaintiff], however, he gave the mechanic the full $300 but them asked the mechanic to loan him $50.  According to [plaintiff], the mechanic agreed and loaned him the $50.

*Id.*, Ex. H at 5.

[52]*Id.*, Ex. A at ¶ 9.

[53]*See id.* at ¶ 10; *id.*, Ex. T at 10.

[54]*See id.*, Ex. C at 9.

14

attendees discussed whether plaintiff's current health insurance would cover treatment for substance abuse.[55]  Harris was asked to call an employee in the Personnel Office to determine which health insurance plan would be most advantageous to plaintiff.[56]  Finally, the attendees discussed plaintiff's ability to perform his regular job functions.  They expressed concern that plaintiff was still under the influence of drugs, that his employment position involved exposure to hazardous machinery and substances, and that plaintiff's impaired judgement could endanger himself and others.[57] Ehl decided that plaintiff should be supervised strictly, and that his duties should be reduced.[58]  Harris did not believe such action was necessary, but he nevertheless acceded to the restriction of plaintiff's duties.[59]

A second meeting was held in the Personnel Office on December 4, 1995.[60]  Danny Hightower, the Deputy Director of Personnel and the drug free workplace coordinator, was asked to attend. Hightower determined that the administration did not have sufficient information to establish the "reasonable suspicion"

---

[55]*See id.*
[56]*See id.*
[57]*See id.* at 7-8; *id.*, Ex. F at 3.
[58]*See id.*, Ex. C at 3.
[59]*See id.*
[60]*See id.* at 10.

standard necessary to require plaintiff to submit to a drug test.[61] Hightower was asked to consider whether plaintiff should be disciplined, or whether he was covered by the EAP "safe harbor" provisions.[62]

Harris and Ehl submitted a personnel action request on December 12, 1995, requesting that plaintiff's position as "Safety & Occupational Health Specialist" be reclassified by virtue of a "detail"[63] to the "Attached set of duties."[64]  The reason for the "detail" was noted:  "Employee needed on special assignment."[65]  The request for personnel action was approved on January 9, 1996, and plaintiff was detailed to perform a different set of duties.[66]  The

---

[61]See id., Ex. T at 11.

[62]See id.

[63]The record does not provide a clear description of what constitutes a detail, but in deposition plaintiff attempted to explain it.  Apparently, when a department is in need of additional or specialized employees, but there is no funding to create a permanent job position, an employee may be "detailed."  The detailed employee will perform a set of designated duties instead of performing the duties of an established position.  See Plaintiff's evidentiary submission, Ex. S at 16.

[64]Id., Ex. L.

[65]Id.

[66]A document entitled "Set of Duties" was attached to the notification of personnel action form.  See Defendant's evidentiary submissions, Tab A (Bates stamped exhibit 3).  The set of duties required that plaintiff perform the following duties that did not involve absence from the Industrial Safety Office:

- Provide test area access safety training ("backdrop badge" training)

- Assist in preparation and implementation of procedures and guidelines for the MSFC Industrial Safety program.

- Prepare written reports of field work, such as safety

16

detail was retroactive to December 17, 1995, and was to continue until April 14, 1996.  It did not change the classification of plaintiff's position as a GS-0018-07 grade, step 4, and it did not affect plaintiff's salary of $26,606 per year.

Harris informed plaintiff of the restrictive detail on December 12, 1995.  Harris told plaintiff that the restrictive detail was imposed as a result of the meetings with personnel, and further informed plaintiff that he would be closely monitored. Plaintiff expressed his concern that the restrictive detail "eliminated all the essential functions of [his] job" and would require his co-workers to perform the tasks of his position.[67] Harris warned plaintiff that he should explain to his co-workers

---

inspections of low-hazard occupancies.

The duties to be performed by plaintiff also included some duties that involved absence from the Industrial Safety Office:

- Safety inspections of low-hazard areas

- Receiving On-the-Job Training related to assessment of compliance with Federal and NASA safety standards, and to industrial processes and hazards that do not involve exposure to the actual hazards; and to mishap investigations.

- Assisting other safety professionals in mishap investigation field work.

- Assist in conduct of fire drills and other planned evacuations.

The set of duties provided that plaintiff was not allowed to work outside of the Industrial Safety Office unless he was accompanied by another safety professional.  *Id.*

[67]Plaintiff's evidentiary submission, Ex. A at ¶ 13.

17

the reason for the restrictive detail before they found out on their own.[68]   Harris said, "well, Matt, you can either tell them yourself or they will find out through the rumor mill."[69]   Plaintiff then walked up and down the hall, informing each employee about the restrictive detail and his substance abuse problem.   Prior to that date, plaintiff had not mentioned his substance abuse problem to anyone at work.

The detail was not immediately imposed, because all non-essential government employees were furloughed as a result of a governmental shutdown.   The furlough lasted from December 15, 1995 until January 8, 1996.[70]

During the furlough, plaintiff telephoned Harris at home. Plaintiff told Harris that he was calling from a local motel, and that Lane Pugh and Marshall Corlew, another MSFC employee, were together in a room there.[71]   Plaintiff told Harris that he had banged on their door, but neither Pugh nor Corlew would allow him to enter.[72]   Harris took no action, because he did not believe plaintiff, and also because he had no official responsibilities due

---

[68]*Id.*

[69]*Id.*, Ex. S at 32.

[70]*Id.*, Ex. B at ¶ 14.

[71]*Id.*, Ex. C at 11.

[72]*Id.*

to the furlough.[73]

On January 12, 1996, after the furlough, Pugh met with Harris to discuss plaintiff.  She told Harris "either Matt has to go, or I do."[74]  She informed Harris that plaintiff had harassed her by following her home, repeatedly calling her at work, and making demands and declarations.[75]  She further accused plaintiff of saying, at one point, "You know, I have a gun."[76]  Pugh indicated that she was afraid of plaintiff, and asked Harris to "do something" about the situation.[77]  Pugh also said that she did not want plaintiff to know that she had precipitated any action against him.[78]  At the time, Harris recalled that on a prior occasion Pugh had accused a male co-worker of threatening her with a gun.[79] Sometime later, Pugh informed Harris that plaintiff was "fooling him" with respect to his whereabouts during the work day, and that plaintiff was intoxicated (Harris presumed on alcohol) during work hours.[80]

Harris immediately met with Ehl to discuss Pugh's accusations.

---

[73]*Id.*

[74]*Id.* at 12; *id.*, Ex. D.

[75]*Id.*, Ex. C at 12.

[76]*Id.*

[77]*Id.*

[78]*Id.*

[79]*Id.*

[80]*Id.* at 13-14.

They then called Bradley Waits, the Director of Security.[81]  During
the meeting, Waits was asked to call the Huntsville Police
Department to determine whether plaintiff had a criminal record.[82]
Plaintiff did not have a record.  Waits was then asked to interview
Pugh and to investigate the allegations.  Waits also decided to
conduct on that day a routine-appearing badge check in the lobby of
the building.[83]  The guard performing the check would be instructed
to assess whether plaintiff appeared to be a threat.[84]  Guards were
then placed outside Pugh's building for ten days.[85]

Later that day, Ehl summoned Harris to his office.  He
directed Harris to:  move Pugh's cubicle assignments, so she and
plaintiff would be as far apart as possible; deny plaintiff the use
of government vehicles; inform plaintiff that the restrictive
detail would be imposed; closely supervise plaintiff; and prepare
a memorandum recording that plaintiff had told Harris about his
substance abuse.[86]

Also on January 12th,[87] Bynum attempted to schedule a meeting

---

[81]Waits stated in affidavit that this meeting occurred in February.  See
id., Ex. G at 2.

[82]*Id.*

[83]*Id.*, Ex. C at 14.

[84]*Id.*

[85]*Id.*, Ex. G at 3.

[86]*Id.*, Ex. C at 15.

[87] Bynum contends this meeting occurred in late November 1995.  *See id.*,
Ex. E at 2.

with Dr. Smith, plaintiff's then EAP psychological counselor, and Dr. Jeanne Richmond, plaintiff's former EAP counselor.[88]   Richmond was retired, but had acted as plaintiff's psychological counselor when he was treated for substance abuse in 1994.[89]   Bynum asserts that he scheduled the meeting to enable Dr. Richmond to assist Dr. Smith by providing her with background information on plaintiff.[90] Dr. Smith refused to attend the meeting.   She asserts that Bynum desired plaintiff to be admitted to a rehabilitation program, but that she did not think it was necessary.[91]   Dr. Richmond later telephoned Dr. Smith to request plaintiff's file, but Dr. Smith refused to relinquish it because of her concerns about confidentiality.[92]

On January 16, 1996,[93] plaintiff met with Harris and Ehl in Ehl's office.   Ehl informed plaintiff that there were reports of him driving erratically on government grounds.   Harris handed to plaintiff a Form 52, officially assigning him to the restrictive detail.   Harris further admonished plaintiff that he was not

---

[88]See *id.* at 2.

[89]*Id.*

[90]*Id.*

[91]*Id.*, Ex. B at 5.

[92]*Id.* at 6.

[93]Harris stated in affidavit that this meeting occurred on January 12, 1996.   See *id.* at 15.

allowed to drive government vehicles, that he was to immediately relocate to another cubicle, that he was not to leave the office without first advising Harris, and that he was to have nothing to do with Pugh.  At the time, Harris did not inform plaintiff of Pugh's allegations against him.  Later that day, Dr. Anne Smith telephoned plaintiff and informed him of the allegations, and that she had discussed them with Bynum and Ehl.[94]

On January 18, 1996, plaintiff informed Harris that he intended to utilize grievance procedures to contest the detail. Harris then told plaintiff that he would be required to park his car within view of Harris' office window, in order that his arrival and departure times could be monitored.  Harris further informed plaintiff that he would be required to report to Harris' office for a sobriety check before he left the office and upon his return.[95]

Plaintiff later met with Hightower.  He asserted that the restrictive detail was not in accordance with the collective bargaining agreement between NASA the American Federation of Government Employees, and he complained that the confidentiality provisions of the EAP had been breached.  Plaintiff then asked Hightower for a copy of the Marshall Management Instruction

---

[94]*Id.*, Ex. A at ¶ 16.
[95]Id. at ¶ 17.

regarding the EAP.  Hightower refused to provide it.[96] Plaintiff then visited Dr. Anne Smith and requested the same document.  She refused, stating that Hightower had telephoned her and instructed her not to provide it to him.[97]

On January 25th, plaintiff informed Hightower that he did not intend to file a grievance.[98]

Meanwhile, James McGraury, an attorney, and William "Mack" Blackman, a personnel management specialist, were investigating Pugh's allegations.  They interviewed plaintiff, who was accompanied by a union representative, and asked him questions about his admission to Crestwood Hospital and his substance abuse.[99] They interviewed a number of individuals, including Pugh and other co-workers.  The investigators found Pugh to be more credible than plaintiff, because an employee had overheard Pugh's side of the telephone conversation during which plaintiff allegedly threatened Pugh with a gun.  They also found that plaintiff had a reputation among other employees for being untrustworthy, and being absent from work without permission.  The investigators verbally briefed

---

[96]*Id.*, Ex. R.  Hightower contends that his version of the document was outdated and that he wanted to ensure that plaintiff received a copy of the current version.

[97]*Id.*, Ex. B at 6.

[98]*Id.* Ex. R.

[99]*Id.*, Ex. I.

management on their conclusion that plaintiff had threatened Pugh with a gun.  They further informed management that it was more likely than not that plaintiff and Pugh had been involved in an affair.[100]

Another investigation was conducted to determine whether plaintiff's confidentiality had been breached, and whether the widespread knowledge of his substance abuse affected management decisions.[101]  The report of the investigation was drafted in June of 1996.  It concluded that plaintiff's confidentiality had indeed been breached in violation of NASA regulations that prohibit any discussion of any aspect of an employee's participation in the EAP without the express written consent of the employee.[102]  The report noted that the restrictions on disclosure are unconditional, even if the employee has informed others about his participation.[103]  It concluded that safeguards to protect the confidentiality of plaintiff's participation in the EAP had been inadequate.[104]  Even so, the report found that the assignment of plaintiff to the detail was an appropriate action due to the hazardous nature of his

---

[100]*Id.* Ex. H.

[101]*See Id.*, Ex. U.

[102]*Id.*

[103]*Id.*

[104]*Id.*

position.[105]   The report further found that the harsh restrictions placed on plaintiff were caused, at least in part, by the widespread knowledge of plaintiff's substance abuse.[106]

Plaintiff resigned on February 29, 1996, before the investigations were completed.   On April 4, 1996, he received a letter dated March 29, 1996, from Major General James M. Link, the Commanding General of Redstone Arsenal, barring him from entering the federal installation at the request of MSFC administrators.

### III. DISCUSSION

The Rehabilitation Act of 1973 prohibits federal agencies from discriminating against otherwise qualified individuals with a disability. *See, e.g., Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999).   A plaintiff establishes a prima facie case of discrimination by showing (1) he has a disability, (2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as the result of the disability.   *See Mullins*, 228 F.3d at 1313; *Sutton*, 185 F.3d at 1207.

### 1. Disability

The Rehabilitation Act defines the concept of "disability" in

---

[105]*Id.*
[106]*Id.*

a manner that includes any individual who:

> **(i)** has a physical or mental impairment which substantially limits one or more of such person's major life activities;

> **(ii)** has a record of such an impairment; or

> **(iii)** is regarded as having such an impairment.

29 U.S.C. § 705(20)(B). Section 705(20)(C)(i) of the Act <u>excludes</u> from the definition of "individual with a disability" anyone who "is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use." Although current drug users are excluded from the definition of "individual with a disability," that section provides a "safe harbor" for former users of illegal drugs who have been rehabilitated. Section 705(20)(C)(ii) provides:

> Nothing in clause (i) shall be construed to exclude as an individual with a disability an individual who—

> **(I)** has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

> **(II)** is participating in a supervised rehabilitation program and is no longer engaging in such use; or

> **(III)** is erroneously regarded as engaging in such use, but is not engaging in such use... .

Surprisingly, defendant does not argue that plaintiff's

illegal use of drugs excludes him from the definition of "individual with a disability." No doubt, this is because defendant asserts that the restrictive detail was imposed upon plaintiff because of the threat to Pugh, rather than because of his illegal substance abuse. However, the facts belie defendant's assertion. The personnel action request for the imposition of a restrictive detail was submitted on December 12, 1995. Pugh did not inform Harris about the gun threat until January 11, 1996, a full month later. Thus, the restrictive detail was instigated before plaintiff allegedly threatened Pugh with a gun. That fact underscores another: the detail was requested as a result of meetings held by management concerning plaintiff's substance abuse. Furthermore, Harris' testimony demonstrates that plaintiff's duties were restricted because management feared that his illegal use of drugs would impair his ability to function in hazardous environments.[107]

Defendant apparently accepts plaintiff's assertion that he was no longer engaging in the illegal use of drugs during the time period relevant to the present action. This court, however, does not accept that assertion.

The Rehabilitation Act does not define or clarify the meaning

---

[107]*See infra* text accompanying notes 56-61.

of the phrase "currently engaging in the use of drugs," and the Eleventh Circuit apparently has not addressed the issue.  Even so, the Fourth Circuit, in *Shafer v. Preston Memorial Hospital*, 107 F.3d 274 (4th Cir. 1997), found that the term "currently" should not be interpreted in a strictly literal sense.

> [T]he ordinary or natural meaning of the phrase "currently using drugs" does not require that a drug user have a heroin syringe in his arm or a marijuana bong to his mouth at the exact moment contemplated.  Instead, in this context, the plain meaning of "currently" is broader.  Here, "currently" means a periodic or ongoing activity in which a person engages (even if doing something else at the precise moment) that has not yet permanently ended.

*Id.* at 278.  The Fourth Circuit concluded that "an employee illegally using drugs in the weeks and months prior to the discharge is a 'current' illegal user of drugs for purposes of the ADA and Rehabilitation Act."  *Id.* at 280.

The majority of courts analyzing the meaning of the phrase "currently engaging in the use of drugs" have defined it in a similar manner.  *See Zenor v. El Paso Healthcare System, Limited*, 176 F.3d 847, 856 (5th Cir. 1999) (citing *Shafer*); *Collings v. Longview Fibre Company*, 63 F.3d 828, 833 (9th Cir. 1995) ("currently engaging" applies to admissions of drug involvement during the weeks and months prior to discharge); *Quigley v.*

*Austeel Lemont Company, Inc.*, 79 F. Supp. 2d 941, 945-946 (N.D. Ill. 2000) (plaintiff's drug involvement within the weeks and months prior to termination indicates current use); *Salley v. Circuit City Stores, Inc.*, No. 96-6368m 1997 WL 701302 at *6 (E.D. Pa. 1997) (citing *Shafer* and listing supporting cases).

The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, contains language parallel to that of the Rehabilitation Act.  The legislative history of the ADA supports the foregoing characterization of the phrase "currently engaging in the use of drugs."  The House Conference Report explains:

> The provision excluding an individual who engages in the illegal use of drugs from protection is intended to ensure that employers may discharge or deny employment to persons who illegally use drugs on that basis, without fear of being held liable for discrimination.  <u>The provision is not intended to be limited to persons who use drugs on the day of, or within a matter of days or weeks before, the employment action in question</u>. Rather, the provision is intended to apply to a person whose illegal use of drugs occurred <u>recently enough to justify a reasonable belief that a person's drug use is current</u>.

H.R.Conf.Rep. 101-596, at 19 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565 (emphasis added).

The legislative history further records a Congressional understanding that an individual's participation in a rehabilitation program does not automatically place him within the

statute's "safe harbor" provisions.

> This provision does not permit persons to invoke the Act's protection simply by showing that they are participating in a drug treatment program. Rather, refraining from illegal use of drugs also is essential. Covered entities are entitled to seek reasonable assurances that <u>no illegal use of drugs is occurring or has occurred recently enough so that continuing use is a real and ongoing problem</u>.

*Id.* at 76 (emphasis supplied).  Regulations promulgated by the Equal Employment Opportunity Commission track the Congressional interpretation.[108]

The facts of this case clearly establish that plaintiff was "currently engaging" in the illegal use of drugs, and that his drug use was "a real and ongoing problem."  Moreover, MSFC management "acted on the basis of such use" in assigning plaintiff to the detail.  The record demonstrates that plaintiff used "crack" cocaine during late 1993 and part of 1994, until he entered the MSFC Employee Assistance Program.  In 1994, plaintiff's former supervisors allowed him to participate in the EAP undisturbed, and allowed him to return to his position following his rehabilitation.

---

[108]29 C.F.R. Pt. 1630, App. (2000) (explanation of 29 C.F.R. § 1630.3) provides:

> The term "currently engaging" is not intended to be limited to the use of drugs on the day of, or within a matter of days or weeks before, the employment action in question.  Rather, the provision is intended to apply to the illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct.

Newton, one of plaintiff's former supervisors, informed Harris of plaintiff's substance abuse problem and participation in the EAP. Nevertheless, Newton recommended plaintiff to Harris, and expressed his confidence that plaintiff had overcome the problem.  Newton's confidence was misplaced.  Harris hired plaintiff and allowed him to work in peace, until he discovered that plaintiff again had been engaging in the illegal use of controlled substances.  Harris learned from Pugh that plaintiff's problem in 1994 had involved the use of "crack" cocaine.  Plaintiff's mother told Harris in November of 1995 that her son was again using "crack" cocaine, and that the abuse was an ongoing problem.  Furthermore, plaintiff's drug use occurred in close temporal proximity to his assignment to the restrictive detail.  Plaintiff last admitted to using "crack" cocaine on November, 17, 1995.  The detail was effective on December 17, 1995, only one month later.  Plaintiff has not stated when — indeed, if ever — he ceased smoking marijuana.

This court accordingly concludes that plaintiff had used "crack" cocaine and other illegal substances during the weeks and months immediately preceding his transfer to the restrictive detail, and that Harris' fears that plaintiff was "currently engaging in the use of drugs" were well-founded.  Furthermore, MSFC management "acted on the basis of such use" when it assigned

31

plaintiff to the detail.

Plaintiff complains of other actions that were temporally more removed from his substance abuse. Such actions include posting guards at the workplace to ensure that he was not dangerous, forbidding him from driving government vehicles, instructing him to park within view of Harris' office, forbidding him from leaving the building unattended, requiring him periodically to report to Harris for "sobriety checks," and ultimately barring him from Redstone Arsenal. However, each of these actions occurred after January 11, 1996, the date on which Pugh informed Harris that plaintiff had harassed her and threatened her with a gun. These actions were precipitated by the threat, not plaintiff's substance abuse. To the extent that plaintiff correctly attributes his employers' actions to their fears that he was currently abusing drugs, plaintiff's employers were "acting on the basis of such use."

Plaintiff asserts that he satisfies the definition of an "individual with a disability" because he was regarded by management officials at MSFC as having the "impairment" of substance abuse. A person is regarded as having an "impairment" if he:

> has a physical or mental impairment that does not
> substantially limit major life activities but is treated
> by an employer as constituting such a limitation; has a

> physical or mental impairment that substantially limits
> major life activities only as a result of the attitude of
> an employer toward such impairment; or [has no physical
> or mental impairment] but is treated by an employer has
> [sic] having such an impairment.

*Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999) (first alteration in original) (quoting 29 C.F.R. § 1614,203(a)(5)). Plaintiff contends that management regarded him as a "drug crazed maniac,"[109] and that their clandestine meetings and subsequent actions demonstrate that they treated his substance abuse as substantially limiting the major life activity of work. Be that as it may, plaintiff was not merely "regarded" as a substance abuser, he <u>was</u> (as discussed above) <u>currently engaging</u> in the illegal use of controlled substances. Thus, his condition was expressly excepted from the definition of "individual with a disability."

### 2.  Otherwise Qualified

Under the second prong of a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must prove that he is "otherwise qualified" for the position.  "A person is 'otherwise qualified' if he or she is able to perform the essential functions of the job in question." *Jackson v. Veterans Administration*, 22 F.3d 277, 278 (11th Cir. 1994).  A plaintiff must be able to demonstrate "that he can perform the essential functions of his job

---

[109]Plaintiff's memorandum at 11.

without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

Plaintiff contends that he was "otherwise qualified," despite his disability of "recovering" from substance abuse, or being perceived as having a disability of substance abuse. He submits that, prior to his admission to the EAP, he received an "outstanding" performance evaluation. He contends that, even after he returned from his medical absence and during his subsequent out-patient rehabilitation, he was able to perform the essential functions of his position. Defendant contends that plaintiff cannot prove that he was "otherwise qualified," because he had threatened Pugh with a gun. Defendant asserts that management could not reasonably allow plaintiff to continue to perform the functions of the job as he had in the past.

At the time management meetings were held and the restrictive detail was imposed upon plaintiff, he was suspected of using "crack" cocaine and of defrauding residents of the Five Points area of Huntsville. Later, he was suspected of harassing and threatening an employee senior to him. Although plaintiff denies

threatening and harassing Pugh, he fails to deny either that he purchased and used an <u>illegal</u> substance, or that he was the "Five Points Con Man." Employees who purchase and possess controlled substances, or who mention their employer's name in a scheme to defraud an entire neighborhood, are not "otherwise qualified" for a position. Generally, an employer need not accommodate an employee's a propensity to engage in illegal acts. *See, e.g., Chapa v. Adams*, 168 F.3d 1036, 1039 (7th Cir. 1999) (an employer is not required to accommodate an employee whose disability disposes him to violent outbursts). Here, an employee alleged that plaintiff threatened her with a gun. Harris and Ehl were entitled to take reasonable, temporary steps to prevent such violence until the allegations could be investigated. Plaintiff, however, quit before the investigation could be concluded.

### 3. Discrimination

Finally, a plaintiff must demonstrate that he was subjected to unlawful employment discrimination. *See Sutton*, 185 F.3d at 1207. In the present action, plaintiff contends that his supervisors discriminated against him by placing him on a restrictive detail, drafting a letter terminating his employment, and barring him from Redstone Arsenal. He contends that the letter of termination and

35

the letter barring him from Redstone Arsenal were not the result of the alleged threat reported by Pugh.   Plaintiff instead contends that the alleged threat was merely a pretext to punish him for his substance abuse, but he has produced no evidence to support his theory.   The letter he received from General James M. Link, barring plaintiff from Redstone Arsenal, explicitly states:

> It has come to my attention that between January 11, 1996, and February 26, 1999, you threatened and harassed your coworker, Ms. Elizabeth H. Pugh.   Your conduct evinces a flagrant disregard for the laws aned regulations which are designed to maintain good order and discipline on this post. [110]

Plaintiff has submitted no evidence to contradict the General's statement.   With the exception of the detail, which was requested before the alleged threat, the foregoing actions constitute a reasonable response by management to an alleged threat of violence. Plaintiff contends that the detail was imposed because he was regarded as having the impairment of substance abuse.   This court agrees that plaintiff's evidence substantiates his contention.   Had plaintiff been an "individual with a disability" who was "otherwise qualified," this court might have found the existence of a material fact with regard to the issue of the detail.   That, however, is not the case.

---

[110]Plaintiff's response to the court's order to furnish more definite statement (doc. no. 18), Attachment 13.

36

## IV. CONCLUSION

Plaintiff may not recover for employment discrimination under the Rehabilitation Act, because he was engaged in the use of illegal drugs during the periods of time relevant to this action. Furthermore, plaintiff was not "otherwise qualified" for the position, because he purchased and possessed "crack" cocaine and used the furlough from his position at the Marshall Space Flight Center to defraud citizens of Huntsville.  Finally, the actions taken by plaintiff's employers were reasonable responses to the allegation that plaintiff harassed a co-worker and threatened her with a gun.  Therefore, the court finds defendant's motion for summary judgment is due to be granted.  An order consistent with this opinion will be issued contemporaneously herewith.

DONE this the 26th day of February, 2001.

_____
United States District Judge